# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 13-710V
Filed: April 24, 2014
Not for Publication

*****************************************
| | |
|---|---|
| RAYMOND SOMOSOT and * | |
| WANWILAI SOMOSOT, on * | |
| Behalf of R.D.S., a Minor, * | |
| * | Dismissal; petition filed outside of |
| Petitioners, * | statute of limitations; statute of |
| * | limitations runs from first symptom |
| v. * | or manifestation of onset, not date of |
| * | diagnosis; influenza vaccine; |
| SECRETARY OF HEALTH * | cerebral palsy |
| AND HUMAN SERVICES, * | |
| * | |
| Respondent. * | |

*****************************************

Lorraine J. Mansfield, Las Vegas, NV, for petitioners.
Lynn E. Ricciardella, Washington, DC, for respondent.

**MILLMAN, Special Master**

## DECISION[1]

On September 23, 2013, petitioners filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa-10–34 (2006), alleging that influenza vaccine administered on December 19, 2007, caused their son R.D.S. to suffer from cerebral palsy ("CP"). According to the petition, R.D.S. became ill three weeks after his vaccination and remained ill three months

---

[1] Because this unpublished decision contains a reasoned explanation for the special master's action in this case, the special master intends to post this unpublished decision on the United States Court of Federal Claims's website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002). Vaccine Rule 18(b) states that all decisions of the special masters will be made available to the public unless they contain trade secrets or commercial or financial information that is privileged and confidential, or medical or similar information whose disclosure would constitute a clearly unwarranted invasion of privacy. When such a decision is filed, petitioner has 14 days to identify and move to redact such information prior to the document's disclosure. If the special master, upon review, agrees that the identified material fits within the banned categories listed above, the special master shall redact such material from public access.

later. Pet. ¶ 8. By December 18, 2008, R.D.S. was diagnosed with microcephaly and hypertonicity. Id. Although petitioners allege that the first symptoms of R.D.S.'s CP were on May 12, 2011, the date he was diagnosed with CP, Id. ¶ 13, the first symptoms of his CP actually occurred at least three years earlier.

> The Vaccine Act provides:
>
>> In the case of . . . a vaccine set forth in the Vaccine Injury Table . . . , if a vaccine-related injury occurred as a result of the administration of such vaccine, no petition may be filed for compensation under the Program for such injury after the expiration of 36 months after the date of the occurrence of *the first symptom or manifestation of onset* or of the significant aggravation of such injury . . . .

42 U.S.C. § 300aa-16(a)(2) (2006) (emphasis added). The first symptoms of R.D.S.'s CP occurred in 2008, more than three years before the petition was filed. Therefore, the petition must be dismissed.

## FACTS

During her pregnancy with R.D.S., Ms. Somosot tested positive for isolated group B streptococci. Med. recs. Ex. 3, at 7. The results of her rubella screening were 8.6 IU/mL, which falls within the borderline range. Id. at 12.

R.D.S. was born on March 15, 2007. Med. recs. Ex. 1, at 1. Ms. Somosot was treated with penicillin for her positive beta streptococci. Med. recs. Ex. 4, at 4. There was heavy meconium in the amniotic fluid, and "meconium" is listed as an infant complication at birth. Id. R.D.S. was a "poor feeder." Id. at 5. He had a head circumference of 32 centimeters, which is below the second percentile for his age, meeting the definition of microcephaly. Id.; Ex. A, at 2.

On November 6, 2007, at almost eight months of age, R.D.S. saw his pediatrician with the complaint of an intermittent rash since he was three months of age. Med. recs. Ex. 5, at 7. The pediatrician diagnosed R.D.S. with eczema. Id. at 8.

On December 19, 2007, at the age of nine months, R.D.S. received flu vaccine. Med. recs. Ex. 2, at 1.

On January 15, 2008, R.D.S. was taken to Southwest Medical Associates, Inc. Med. recs. Ex. 5, at 20. He had been in the emergency room four days earlier with a cough and runny nose. Id. He was diagnosed with an ear infection and given an antibiotic and medication to help him

breathe.  Id.  The diagnosis was bronchiolitis.  Id.  He had previously had fever, but the fever stopped.  Id.

On March 18, 2008, R.D.S. returned to Southwest Medical Associates, Inc.  Id. at 22.  He was on Albuterol Sulfate and Pulmicort.  Id.  He had an upper respiratory infection lasting one week consisting of low-grade fever, runny nose, and cough.  Id.  He had some vomiting after feeding.  Id.  He was diagnosed with gross motor delays.  Id. at 23.

On April 3, 2008, R.D.S. returned to Southwest Medical Associates, Inc.  Id. at 24.  His pediatrician noted that he appeared to have decreased axial skeleton tone.  Id.  His parents said he was unable to sit independently very well.  Id.  He was assessed with reactive airway disease and gross motor delays.  Id. at 25.

On April 10, 2008, R.D.S. continued to be assessed with reactive airway disease.  Id. at 26.

On May 27, 2008, R.D.S. was noted to have some global developmental delays and delayed speech.  Id. at 28.

On June 27, 2008, R.D.S. saw Dr. Ajaz Ahmad Sheikh, a pediatric gastroenterologist, for a history of vomiting since he was a baby.  Med. recs. Ex. 6, at 6.  R.D.S.'s father said that in the previous one and one-half months, there had been an increase in the frequency of R.D.S.'s vomiting.  Id.  R.D.S. vomited after almost every feeding and, many times, he refused to eat during the day.  Id.  R.D.S.'s mother said that he was losing weight.  Id.  He had difficulty with feeding when he was born, and he was receiving early intervention services for developmental delay.  Id.

On August 1, 2008, R.D.S. returned to Dr. Sheikh.  Id. at 2.  Dr. Sheikh noted that R.D.S. had a history of poor weight gain and vomiting but was doing well on Zantac.  Id.  On examination, R.D.S. had increased muscle tone in his extremities and developmental delay.  Id.  Dr. Sheikh's assessment was that R.D.S. had a history of failure to thrive, poor weight gain, and hypertonic muscles with developmental delay.  Id. at 3.

On October 1, 2008, at one year and six months old, R.D.S. saw Dr. Donald W. Johns, a neurologist, because he was not eating well and had delayed motor skills.  Med. recs. Ex. 7, at 15.  R.D.S. walked using a walker.  Id.  He could not crawl.  Id.  He did not point to indicate his needs.  Id.  The parents thought R.D.S.'s language peaked in January 2008, and then he lost some abilities.  Id.  R.D.S. had environmental allergies, a question of reactive airway disease, eczema, and Mongolian spot.  Id.  R.D.S. did not sit without support.  Id. at 14.  His head circumference was 44.4 centimeters, about four standard deviations below mean.  Id.  Dr. Johns' impression was that R.D.S. had severe microcephaly.  Id.  Dr. Johns was concerned about a possible degenerative condition.  Id.

3

On December 18, 2008, R.D.S. had a genetics consultation with Dr. Colleen A. Morris. Med. recs. Ex. 5, at 29. The reason for the referral was microcephaly and developmental delay. Id. R.D.S.'s mother reported that R.D.S. seemed to have normal development for his first four months of life. Id. at 30. At the age of nine months, R.D.S. went with his family to California for a visit, and he was ill when he came home. Id. He could not breathe well, had an ear infection, and did not eat anything for four days. Id. He went to the emergency room, where he was given IV fluids and breathing treatments. Id. R.D.S.'s mother reports that after this illness, R.D.S. was not himself, was more irritable, and would cry much of the time. Id. She also said she was concerned because his development seemed to stop. Id. At 17 months, he was noted to have head lag, and at 19 months, he could tripod sit but was not yet walking. Id. His mother noted he had bilateral cortical thumbs for quite some time before the visit with Dr. Morris. Id. He had Mongolian spots over his skin, significant eczema, and gastroesophageal reflux disease in the past. Id. Whenever his family tried to get him to bear weight, he would stand on his toes. Id. He was receiving physical therapy once a week. Id.

At the December 18, 2008 visit with Dr. Morris, R.D.S.'s family reported that he had a workup for failure to thrive because his length had been consistently at the third percentile, and his weight at two months was at the tenth percentile, but by nine months was below the third percentile. Id. His weight for height at the time of examination was just below the third percentile. Id. His head circumference at birth was at the second percentile and was below the second percentile at the age of four months. Id. His head circumference was growing but was falling further away from the curve over time. Id. When Dr. Morris examined R.D.S., his height was in the third percentile, and his weight and head circumference were below the third percentile. Id. He had ridging of the anterior sagittal and metopic sutures and frontal narrowing of the cranium. Id. He had hyperreflexia in his lower extremities. Id. at 31. His heel cords were tight. Id. When attempting to get R.D.S. to bear weight, Dr. Morris found that he would stand only on his toes. Id. Dr. Morris diagnosed R.D.S. with microcephaly and hypertonicity. Id. Dr. Morris noted that based on her review of the records, he did not have microcephaly before becoming ill at age nine months. Id.

On June 1, 2009, Sunshine Valley Pediatrics listed R.D.S. as having developmental delay. Med. recs. Ex. 8, at 2.

On August 13, 2009, at the age of two years and five months, R.D.S. saw Dr. Johns again for a pediatric neurological evaluation. Med. recs. Ex. 7, at 12. Dr. Johns noted that R.D.S. had increased tone with gait, suggestive of white matter disease. Id. at 11. When placed in a standing and supported position, R.D.S. walked on his toes, flexed his elbows, and pronated his forearms. Id. Dr. Johns diagnosed R.D.S. with microcephaly and developmental delay of unclear etiology and recommended a pediatric orthopedic evaluation. Id.

On August 31, 2009, R.D.S. saw Dr. Howard I. Baron, a pediatric gastroenterologist, for failure to thrive. Med. recs. Ex. 6, at 21. Dr. Baron notes that R.D.S. was very behind verbally. Id. He took fluids exclusively by bottle but was working on drinking through a straw. Id. His

growth was satisfactory, although below the growth curve since his last visit.  Id.  He had dysphagia, choking on solids or water.  Id.  Dr. Baron's assessment was that R.D.S. was self-limited in his ability to tolerate a variety of textures.  Id. at 22.  Dr. Baron suggested high-density calories packed in purees and milks to help R.D.S. grow.  Id.

      On December 17, 2009, R.D.S. saw Dr. Roshan Raja, a pediatric neurologist, for hypertonia and developmental delay.  Med. recs. Ex. 7, at 1.  R.D.S. was not walking and had not been sitting even at nine months.  Id.  He was first noted to have a problem after a significant viral infection when he was nine months old.  Id.  After this viral infection, R.D.S. regressed further with some aspects, such as speech and weight.  Id.  At that time, he was also stiff and had cortical thumbing.  Id.  He started therapy at fifteen months and began improving his fine motor skills.  Id.  However, comprehension was difficult.  Id.  He wore braces and wrist splints, and he drooled.  Id. at 2.  Dr. Raja's impression was developmental delay, post-infectious worsening of delays, microcephaly, and hypertonia.  Id. at 3.

      Cerebral palsy is first mentioned in the medical records on May 9, 2011.  Med. recs. Ex. 8, at 18.  On that date, R.D.S.'s pediatrician, Dr. Wesley J. Robertson at Sunshine Valley Health Care, wrote on a prescription pad that R.D.S. had a severe fever two weeks after a flu vaccination at nine months of age.  Med. recs. Ex. 9, at 2.  Dr. Robertson continues, saying R.D.S. developed severe cerebral palsy afterward.  Id.  Dr. Robertson writes it is "possible" the vaccine was the cause of the CP.  Id.

      On May 12, 2011, R.D.S. was seen for a follow up of a head injury at Sunshine Valley Pediatrics.  Med. recs. Ex. 8, at 18; Ex. 9, at 3.  Dr. Robertson notes cerebral palsy as a diagnosis.  Id. The records thereafter mention CP as one of R.D.S.'s diagnoses.  See, e.g., Ex. 8, at 2, 11, 15, 17.

## PROCEDURAL HISTORY

      Petitioners filed their petition on September 23, 2013.

      On January 13, 2014, the undersigned issued an Order to Show Cause.  The undersigned noted that although R.D.S.'s CP was diagnosed on May 12, 2011, the first symptom or manifestation of the onset of his CP occurred in 2008.  The undersigned stated that the petition was filed outside the three-year statute of limitations, 42 U.S.C. § 300aa-16(a)(2), and ordered petitioners to show cause why the case should not be dismissed.

      During a telephonic status conference on January 14, 2014, the undersigned discussed her Order to Show Cause and the parties' deadlines for their respective responses and replies.

      On February 6, 2014, petitioners filed a Response to Order to Show Cause.  Petitioners argue that the onset of R.D.S.'s cerebral palsy was August 2011, the date that they assert cerebral

palsy first appears in the medical records.[2]  Petitioners list symptoms of cerebral palsy, including "muscles that are very tight and do not stretch," "abnormal gait," "floppy muscles," "speech problems," and "difficulty sucking or feeding in infants."  Pet'rs' Resp. at 6–7.  Petitioners assert that their argument is consistent with Cloer v. Sec'y of HHS, 654 F. 3d 1322 (Fed Cir. 2011), because the board-certified pediatricians who examined R.D.S. did not diagnose him with CP and would not have recognized his well-baby checkups as symptoms of CP until August 2011.[3]  Pet'rs' Resp. at 10.  Petitioners assert that the medical literature cited in the undersigned's Order to Show Cause should be rejected.  Id.  They cite page 14 of Judge Lettow's slip opinion in Paluck v. Sec'y of HHS, No. 07-889, 113 Fed. Cl. 201 (Fed. Cl. 2013), which refers to Judge Lettow's prior ruling in the same case, 104 Fed. Cl. 457, 483 (Fed. Cl. 2012), where he found that the Special Master's finding of the appropriate interval between vaccination and injury (Althen prong 3) was arbitrary and capricious because it was not supported by the expert testimony and medical records.[4]  Pet'rs' Resp. at 10.  They also assert that the undersigned must seriously consider the opinions of the treating physicians and the medical records.  Id. at 11.  Petitioners assert that R.D.S.'s hypertonicity, gross motor delays, not sitting well, and developmental delay were symptoms of other conditions and that cerebral palsy is a separate medical entity from these symptoms.  Id. at 9–10, 12.

On March 7, 2014, respondent filed a Response to Petitioners' Response to Order to Show Cause.  Respondent gives a recitation of the relevant facts and argues that the onset of R.D.S.'s cerebral palsy began as early as January 2008 and as late as 2009.  Resp't's Resp. at 2–7, 9–10.  Respondent discusses Cloer and Markovich, 477 F.3d 1353 (Fed. Cir. 2007), which state that the statute of limitations begins to run at the first "symptom" or "manifestation of onset," neither of which require a doctor to diagnose the injury definitively.  Id. at 10.  Respondent argues that the medical records and petitioners' allegations show that the claim is time-barred.  Id. at 11–12.  Respondent attaches a declaration from Terry Dalle-Tezze, M.D., a medical officer employed with the Department of Health and Human Services, Division of

---

[2] It is unclear why petitioners assert that the onset of R.D.S.'s CP occurred in August 2011.  As noted by respondent, petitioners refer to two different onsets in their response: August 24, 2011, Pet'rs' Resp. at 6, and August 12, 2011.  Id. at 11.  The medical records first refer to a diagnosis of CP on May 9, 2011.  Med. recs. Ex. 9, at 2.  A diagnosis of cerebral palsy is also listed on August 24, 2011, Med. recs. Ex. 8, at 2, 15; however, this is not the first reference.

[3] There are several mistakes in petitioners' response.  Petitioners assert, "The *medical community* did not, and would not, have recognized [R.D.S.'s] well-baby check-ups as including symptoms of *multiple sclerosis*." Pet'rs' Resp. at 10 (second emphasis added).  The undersigned assumes that petitioners mean cerebral palsy rather than multiple sclerosis since there has been no allegation that R.D.S. developed multiple sclerosis.  Rather, petitioners seem to be confusing the facts in this case with the facts of Cloer, as this error comes in the paragraph following petitioners' discussion of Cloer.

[4] This argument misconstrues the issue in this case.  The issue here is the onset of R.D.S.'s CP as related to the statute of limitations, not whether the timing interval between R.D.S.'s vaccination and the onset of his CP is appropriate as related to causation in fact.

6

Vaccine Injury Compensation, in which Dr. Dalle-Tezze opines that R.D.S. displayed symptoms of cerebral palsy at birth, six months of age, and throughout 2008.  Ex. A, at 2.

On March 17, 2014, petitioners filed a Sur-Response to Order to Show Cause.  Petitioners argue that Dr. Dalle-Tezze's declaration is inadequate because his opinion contradicts the opinions of the board-certified pediatricians and pediatric specialists who examined and treated R.D.S.  Pet'rs' Sur-Resp. at 2.  Petitioners argue that since none of these pediatricians or specialists diagnosed R.D.S. with cerebral palsy or noted it as a differential diagnosis prior to May 12, 2011, his onset could not have been prior to that date.  Id. at 3.

A telephonic status conference was held on March 19, 2014.  The undersigned discussed that petitioners did not have a medical doctor opining that R.D.S. did not exhibit signs or symptoms of CP prior to his diagnosis in May 2011.  Petitioners' counsel requested thirty days, until April 18, 2014, to consult with doctors to see if any of them would offer an opinion that R.D.S.'s symptoms prior to 2011 were not indicative of CP.  On April 16, 2014, petitioners filed a status report indicating that they had no additional material to file in this matter.

**DISCUSSION**

The United States is sovereign, and no one may sue it without the sovereign's waiver of immunity.  United States v. Sherwood, 312 U.S. 584, 586 (1941).  When Congress waives sovereign immunity, courts strictly construe that waiver.  Library of Congress v. Shaw, 478 U.S. 310, 311 (1986); McGowan v. Sec'y of HHS, 31 Fed. Cl. 734, 740 (Fed. Cl. 1994); Edgar v. Sec'y of HHS, 29 Fed. Cl. 339, 345 (Fed. Cl. 1993); Patton v. Sec'y of HHS, 28 Fed. Cl. 532, 535 (Fed. Cl. 1993), aff'd 25 F.3d 1021 (Fed. Cir. 1994); Jessup v. Sec'y of HHS, 26 Cl. Ct. 350, 352–53 (Cl. Ct. 1992).  A court may not expand on the waiver of sovereign immunity explicitly stated in the statute.  Broughton Lumber Co. v. Yeutter, 939 F.2d 1547, 1550 (Fed. Cir. 1991).

The Vaccine Act requires that a petition be filed within "36 months after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of [the alleged] injury."  42 U.S.C. § 300aa-16(a)(2).  The statute of limitations in the Vaccine Act for personal injury starts to run on the day of "the first symptom or manifestation of onset," not on the day that the injury was diagnosed.  Cloer, 654 F.3d at 1335.  The Federal Circuit has held that "the symptom or manifestation of onset must be recognized as such by the medical profession at large."  Id. at 1335.  The Federal Circuit discussed in Cloer that there is no discovery rule under the Vaccine Act.  Id at 1337.  The date of the first symptom or manifestation of onset "does not depend on when a petitioner knew or reasonably should have known anything adverse about her condition," nor does it depend on whether a petitioner knew or should have known a connection between her injury and the vaccine.  Id. at 1339.

In Cloer, a doctor's petition was found untimely and dismissed because although she sued within three years of her multiple sclerosis ("MS") diagnosis, she did not sue within three years

7

of the first symptom or manifestation of onset of her MS.  Id. at 1329–30.  The Federal Circuit held that the statute of limitations does not start to run when a clinically definite diagnosis is made but rather when the first symptom or manifestation of onset of the illness occurs.  Id. at 1335.  The Federal Circuit affirmed the lower court's finding that the first symptom of Dr. Cloer's MS was the Lhermitte sign, an electric shock sensation that went down the center of her back, which she experienced six years before her diagnosis and eight years before she filed her petition.  Id. at 1327–28, 1330.

In Markovich, the Federal Circuit elaborated on the meaning of the terms "symptom" or "manifestation of onset."  477 F.3d at 1357.  "A symptom may be indicative of a variety of conditions or ailments, and it may be difficult for lay persons to appreciate the medical significance of a symptom with regard to a particular injury."  Id.  In contrast, "a manifestation of onset is more self-evident of an injury and may include significant symptoms that clearly evidence an injury."  Id.  Either a symptom or manifestation of injury can trigger the statute of limitations, "whichever is first."  Id.  A symptom or manifestation of injury may be subtle.  Id. at 1358.  For example, in Markovich, the Federal Circuit determined that the vaccinee's eye blinking episodes were the first symptom of a seizure disorder.  Id. at 1357.

In order to satisfy the statute of limitations in this case, R.D.S.'s first symptom or manifestation of onset would have had to occur on or after September 23, 2010.  Although R.D.S. was diagnosed with CP in May 2011, the first symptom or manifestation of onset occurred in 2008 or earlier.

The most common signs of CP are spasticity and walking on the toes.  NINDS Cerebral Palsy Information Page, National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/cerebral_ palsy/cerebral_palsy.htm (last updated Aug. 21, 2013).  A person with CP might need to use special equipment to be able to walk.  Id.  Many children with CP have problems with speech.  Facts About Cerebral Palsy, Centers for Disease Control and Prevention, http://www.cdc.gov/ncbddd/cp/facts.html (last updated Dec. 27, 2013). Petitioners also list all of these symptoms as symptoms of cerebral palsy. [5]  Pet'r's Resp. at 7–8. Other symptoms of cerebral palsy include difficulty with feeding.  Id.

Petitioners assert in their affidavits that R.D.S. became ill after their visit to California in January 2008, and he "was not himself" thereafter.  Ex. 10, at 3.  The medical records show that R.D.S. was a poor feeder from birth.  Med. recs. Ex. 4, at 5; Ex. 6, at 6.  He was first diagnosed with gross motor delays on March 18, 2008.  Med. recs. Ex. 5, at 23.  On April 3, 2008, he had decreased skeletal tone and was unable to sit independently.  Id. at 24.  On May 27, 2008, he was noted again to have global developmental delays and delayed speech.  Id. at 28.  On August 1, 2008, he was noted to have a history of failure to thrive, poor weight gain, hypertonic muscles,

---

[5] Petitioners argue in their Response to reject this medical literature (which was also listed in the undersigned's previous Order to Show Cause), but the medical literature cited in their Response lists the same symptoms.  Pet'r's Resp. at 7–8.

8

and developmental delay. Med. recs. Ex. 6, at 3. On October 1, 2008, he was not crawling, could walk only with a walker, and had a head circumference of four deviations below the mean. Med. recs. Ex. 7, at 14–15. On December 18, 2008, R.D.S. was not walking, stood only on his toes, was diagnosed with microcephaly, and had trouble feeding, head lag, bilateral cortical thumbs, a head circumference below the third percentile, hyperreflexia in his lower extremities, and tight heel cords. Med. recs. Ex. 5, at 29–31.

Dr. Dalle-Tezze opines that R.D.S. "had microcephaly from birth, failure to thrive from six months of age, and demonstrated signs of persistent developmental delay and abnormal muscle tone beginning in 2008, which were all signs and symptoms of what was subsequently diagnosed as cerebral palsy in 2011." Ex. A, at 2. She concludes that R.D.S. had microcephaly because his head circumference was 32 centimeters at birth, which was below the second percentile for his age, and microcephaly is defined as a head circumference that is below the fifth percentile. Id. She also concludes that he had failure to thrive at six months, because his weight was below the second percentile, meeting the failure to thrive definition of below the third percentile. Id.

Petitioners' argument that this petition was filed within the statute of limitations because R.D.S. was not diagnosed with CP until 2011 misconstrues the law. It is clearly established law that the statute of limitations begins to run at the first symptom or manifestation of onset. Cloer, 654 F.3d at 1335. The statute of limitations can and often does begin to run before a petitioner's condition is diagnosed definitively. The medical records as well as petitioners' affidavits show that R.D.S. exhibited numerous symptoms of CP before September 23, 2010, the date that would be needed for the statute of limitations to be satisfied. Dr. Dalle-Tezze, a medical doctor, opined that the onset of R.D.S.'s CP occurred in 2008 or earlier. Although given the opportunity to do so, petitioners have not provided any medical opinion disputing Dr. Dalle-Tezze's conclusions. The undersigned finds that the first symptoms of R.D.S.'s CP occurred in 2008 or earlier, when he showed symptoms of microcephaly, failure to thrive, poor feeding, hypertonicity, developmental delays, speech delays, and difficulty sitting and walking. Petitioners filed their petition outside of the three-year statute of limitations, and therefore the petition must be dismissed.

## CONCLUSION

The petition is **DISMISSED**. In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[7]

---

[7] Pursuant to Vaccine Rule 11(a), the entry of judgment can be expedited by each party, either separately or jointly, filing a notice renouncing the right to seek review.

**IT IS SO ORDERED.**

April 24, 2014 					s/Laura D. Millman
DATE 						Laura D. Millman
						Special Master