# In the United States Court of Federal Claims

No. 13-710 V

(Filed October 3, 2014)[1]

* * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| RAYMOND SOMOSOT and WANWILAI SOMOSOT, on behalf of R.D.S., a minor,          *<br><br>       *<br>       *<br>       *<br>*Petitioners*,  *<br>       *<br>    v.     *<br>       *<br>SECRETARY OF HEALTH AND HUMAN SERVICES,  *<br>       *<br>*Respondent*.   * | National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-1 to -34 (2012); Untimely Petition under 42 U.S.C. § 300aa-16(a)(2). |

* * * * * * * * * * * * * * * * * * * * * * *

*Lorraine J. Mansfield*, Las Vegas, NV, for petitioners.

*Lynn E. Ricciardella*, United States Department of Justice, with whom were *Stuart F. Delery*, Assistant Attorney General, *Rupa Bhattacharyya*, Director, *Vincent J. Matanoski*, Deputy Director, and *Gabrielle M. Fielding*, Assistant Director, Washington, DC, for respondent.

———————————————

**OPINION**

———————————————

**BUSH,** *Senior Judge.*

———————————

[1]/ Pursuant to Rule 18(b) of Appendix B of the Rules of the United States Court of Federal Claims, this Opinion and Order was initially filed under seal on September 15, 2014. Pursuant to ¶ 4 of the ordering language, the parties were to propose redactions of the information contained therein on or before September 30, 2014. No proposed redactions were submitted to the court.

Now pending before the court is petitioners' motion for review of the special master's dismissal of petitioners' petition for compensation under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-1 to -34 (2012) (the Vaccine Act). *See Somosot ex rel. R.D.S. v. Sec'y of Health & Human Servs.*, No. 13-710V, 2014 WL 1926491 (Fed. Cl. Spec. Mstr. Apr. 24, 2014). Petitioners seek compensation on behalf of their son R.D.S., who allegedly developed cerebral palsy (CP) as a result of an influenza vaccination administered on December 19, 2007. The special master dismissed the petition as untimely under 42 U.S.C. § 300aa-16(a)(2), based on the special master's finding that R.D.S. first displayed symptoms of CP more than three years before the filing of the petition on September 23, 2013. The court, finding no error in the special master's findings of fact or conclusions of law, sustains the dismissal.

## BACKGROUND[2]

### I.     Factual Background

R.D.S. was born on March 15, 2007. Ex. 1. Within days of his delivery, R.D.S. was observed to be a "poor feeder" and his head circumference was measured to be below the second percentile for his age, which meets the definition of microcephaly. Ex. 4 at 5; Ex. A at 2.[3]

R.D.S. received an influenza vaccination during his nine-month well-baby visit on December 19, 2007. Ex. 2. Nearly one month later, on January 15, 2008, R.D.S. visited his pediatrician after being seen in the emergency room four days earlier with a cough, runny nose, wheezing, and fever. Ex. 5 at 20. The pediatrician diagnosed bronchiolitis. *Id.* On March 18, 2008, R.D.S. returned to

---

[2] The facts recounted here are undisputed, although the parties dispute the significance of certain well-established facts. The court relies on the record of underlying proceedings before the special master, as well as petitioner's motion for review (Pet'rs' Mot.) and respondent's response to that motion (Resp't's Resp.). Petitioner's exhibits before the special master were numbered (Exs. 1-11), whereas respondent's one exhibit was marked alphabetically (Ex. A).

[3] According to Dr. Terry Dalle-Tezze, a medical officer with the Department of Health and Human Services, Division of Vaccine Injury Compensation, microcephaly is defined as "a head circumference that is 3 standard deviations below the mean of the 50th percentile, [*i.e.*,] the 5th percentile." Ex. A at 2.

his pediatrician after experiencing one week of low-grade fever, runny nose, and cough.  *Id.* at 22.  The pediatrician diagnosed an upper respiratory infection, and also observed "gross motor delays."  *Id.* at 22-23.

R.D.S. visited his pediatrician again on April 3, 2008, at his one-year well-baby visit, after having visited the emergency room a few days earlier with acute wheezing and constant nasal discharge.  Ex. 5 at 24.  The pediatrician noted that R.D.S. appeared to have "decreased axial skeletal tone" and that his parents stated that he had difficulty sitting independently.  *Id.*  On May 27, 2008, at R.D.S.'s fourteen-month well-baby visit, his pediatrician observed that R.D.S. had "global developmental delays" and "delayed speech."  *Id.* at 28.

On June 27, 2008, R.D.S. was seen by Shadi Usefi-Moridani, a pediatric gastroenterology nurse practitioner, for a "history of vomiting" which had increased in frequency over time.  Ex. 6 at 6.  His parents reported that R.D.S. was vomiting after almost every feeding, was refusing to eat, and was losing weight.  *Id.*  The nurse practitioner noted that R.D.S. was receiving early intervention services for his developmental delay.  *Id.*  At a follow-up visit on August 1, 2008, R.D.S. was noted to have a "history of failure to thrive, poor weight gain and hypertonic muscles with developmental delay."  *Id*. at 3.

On October 1, 2008, R.D.S. visited Dr. Donald Johns, a pediatric neurologist, because he was "not eating well" and was "behind on [his] motor skills."  Ex. 7 at 15.  R.D.S.'s parents indicated that he could not crawl, walked only with a walker, and did not point to indicate his needs.  *Id.*  Dr. Johns observed that R.D.S. "[s]its only with support."  *Id.* at 14.  Dr. Johns diagnosed "[s]evere microcephaly," and noted that he was "concerned about [a] possible degenerative condition."  *Id.*

On December 18, 2008, R.D.S. had a genetics consultation with Dr. Colleen Morris upon referral for microcephaly and developmental delay.  Ex. 5 at 29.  R.D.S.'s mother reported to Dr. Morris that R.D.S.'s development, although progressing normally for the first four months of his life, "seemed to stop" after he became ill at age nine months.  *Id.* at 30.  R.D.S.'s mother also noted that R.D.S. often "choke[d] and cough[ed] during feeding" and had "head lag" and "bilateral cortical thumbs."  *Id.*  By age nineteen months, R.D.S. was not walking independently and was receiving physical therapy once per week.  *Id.*  Upon

3

examining R.D.S., Dr. Morris observed him to have a head circumference below the third percentile for his age, as well as "ridging of the anterior sagittal and metopic sutures" and "frontal narrowing of the cranium." *Id.* R.D.S. was also noted to have "hyperreflexia in the lower extremities" and tight heel cords. *Id.* at 31. In addition, R.D.S. stood only on his toes when made to stand and bear weight. *Id.* Based on her examination, Dr. Morris diagnosed microcephaly and hypertonicity. *Id.*

R.D.S. began with a new pediatric practice, Sunshine Valley Pediatrics (Sunshine), in or about June 2009. Ex. 8. R.D.S.'s medical records from Sunshine reveal that he was consistently assessed to have severe developmental delays from June 2009 through the end of 2010. *Id.* at 2, 24-28.

On August 13, 2009, R.D.S. visited Dr. Johns for a second neurological evaluation. Ex. 7 at 11-12. Dr. Johns observed that R.D.S. walked on his toes, flexed his elbows, and pronated his forearms when supported in a standing position. *Id.* at 11. Dr. Johns diagnosed microcephaly and developmental delay, and recommended that R.D.S. receive a pediatric orthopedic evaluation. *Id.* at 11-12.

On August 31, 2009, R.D.S. visited Dr. Howard Baron, a pediatric gastroenterologist. Ex. 6 at 21-22. According to Dr. Baron's notes, R.D.S. was reported to be choking on water and solids, and was only able to eat pureed food. *Id.* at 21. In addition, although R.D.S. was working on drinking through a straw, he was still exclusively using a bottle to consume liquids. *Id.* Dr. Baron assessed "[f]ailure to thrive" and noted that R.D.S. was "limited in [his] ability to take a variety of [food] textures." *Id.* at 22.

On December 17, 2009, R.D.S. had a neurology consultation with Dr. Roshan Raja, another pediatric neurologist. Ex. 7 at 1-3. According to Dr. Raja's notes, R.D.S. was first noted to have developmental problems at nine months old, when he experienced a "significant viral infection." *Id.* at 1. After the infection, R.D.S. "regressed further with some aspects, such as [his] speech and weight." *Id.* For example, R.D.S. was noted to be "stiff" and to have "cortical thumbing." *Id.* By the time of Dr. Raja's examination, R.D.S. was still not walking independently, wore braces and wrist splints, and had a tendency to "tiptoe" on his ride side when standing. *Id.* at 1-2. Dr. Raja also noted that R.D.S.'s feeding had "only mildly

4

improved." *Id.* at 1.  Based upon his observations, Dr. Raja diagnosed developmental delays, "post-infectious worsening of delays," microcephaly, and hypertonia.  *Id.* at 3.

The first reference to CP in R.D.S.'s medical records occurred on May 12, 2011, when R.D.S. was examined by Dr. Wesley Robertson, a pediatrician at Sunshine, following a head injury.  Ex. 8 at 18.  Dr. Robertson listed CP as a diagnosis.[4]  *Id.*  The pediatric records thereafter consistently listed CP as one of R.D.S.'s diagnoses.  *E.g.*, Ex. 8 at 2, 6-8, 10-11, 15-17.

On May 9, 2013, Dr. Robertson wrote on a prescription pad that R.D.S. had developed a "severe fever" two weeks after receiving an influenza vaccination at nine months of age, and thereafter developed "severe" CP.  Ex. 9 at 2.  Dr. Robertson noted that "it is possible the vaccine was the cause of the CP."  *Id.*

## II.    Procedural History

Petitioners filed their petition for compensation under the Vaccine Act on September 23, 2013, alleging that R.D.S. developed CP as a result of the influenza vaccination he received on December 19, 2007.  On January 13, 2014, the special master ordered petitioners to show cause why their claim should not be dismissed as untimely pursuant to 42 U.S.C. § 300aa-16(a)(2).  In her order, the special master noted that R.D.S.'s medical records revealed that "the first symptom or manifestation of onset [of R.D.S.'s CP] occurred early in 2008," more than three years before the filing of the petition.  Order of Jan. 13, 2014, at 5.

Petitioners filed a response on February 6, 2014, alleging that the symptoms of R.D.S.'s CP first manifested in August 2011.  Respondent filed a response to petitioners' response on March 7, 2014, asserting that the petition was filed after the expiration of the statutorily prescribed limitations period because R.D.S. began showing symptoms of CP as early as 2008.  Respondent attached to her response a declaration prepared by Dr. Terry Dalle-Tezze, a medical officer with the Department of Health and Human Services, Division of Vaccine Injury

---

[4]  The special master incorrectly identified May 9, 2011 as the date on which R.D.S.'s treating physicians first noted CP as a diagnosis.  *See Somosot*, 2014 WL 1926491, at *3 (citing Ex. 8 at 18, Ex. 9 at 2).

Compensation. Ex. A. Upon reviewing R.D.S.'s medical records, Dr. Dalle-Tezze concluded that R.D.S. "had microcephaly from birth, failure to thrive from six months of age, and demonstrated signs of persistent developmental delay and abnormal muscle tone beginning in 2008, which were all signs and symptoms of what was subsequently diagnosed as cerebral palsy in 2011." *Id.* at 2.

On March 19, 2014, the special master issued an order in which she noted that petitioners had not submitted any statement by a medical doctor refuting Dr. Dalle-Tezze's opinion that R.D.S. had displayed symptoms of CP before 2011. On April 16, 2014, petitioners filed a status report stating that they had no additional information to file in this case.

On April 24, 2014, the special master issued her decision dismissing the petition as untimely under 42 U.S.C. § 300aa-16(a)(2). Based upon her review of R.D.S.'s medical records as well as the declaration submitted by Dr. Dalle-Tezze, the special master found that "the first symptoms of R.D.S.'s CP occurred in 2008 or earlier," more than three years before the filing of the petition on September 23, 2013. *Somosot*, 2014 WL 1926491, at *7. Since the Vaccine Act requires that all petitions for vaccine-related injuries be filed within the three-year period from the first symptom or manifestation of onset, the special master determined that petitioners had filed their petition outside of the three-year statute of limitations.

Petitioners filed a timely motion for review of that decision on May 6, 2014, asserting that the special master's dismissal was arbitrary, capricious, an abuse of discretion, and not in accordance with law.

## DISCUSSION

### I. Standards of Review

This court has jurisdiction to review the decision of a special master in a Vaccine Act case. 42 U.S.C. § 300aa-12(e)(2). "Under the Vaccine Act, the Court of Federal Claims reviews the decision of the special master to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'" *de Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1350 (Fed. Cir. 2008) (alteration in original) (quoting 42 U.S.C. § 300aa-12(e)(2)(B), and citing *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1277 (Fed. Cir.

2005)). The court may sustain the special master's decision, set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or remand the petition to the special master for further action in accordance with the court's decision. 42 U.S.C. § 300aa-12(e)(2).

This court uses three distinct standards of review in Vaccine Act cases, depending upon which aspect of a special master's judgment is under scrutiny:

> These standards vary in application as well as degree of deference. Each standard applies to a different aspect of the judgment. Fact findings are reviewed . . . under the arbitrary and capricious standard; legal questions under the "not in accordance with law" standard; and discretionary rulings under the abuse of discretion standard.

*Munn v. Sec'y of the Dep't of Health & Human Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992).

The arbitrary and capricious standard of review, applied to the special master's factual findings, is limited in scope and is highly deferential. *Lampe v. Sec'y of Health & Human Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000); *Burns v. Sec'y of the Dep't of Health & Human Servs.*, 3 F.3d 415, 416 (Fed. Cir. 1993); *Munn*, 970 F.2d at 870 (noting that the arbitrary and capricious standard of review is "well understood to be the most deferential possible") (citations omitted). Under this standard, "[i]f the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines ex rel. Sevier v. Sec'y of the Dep't of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991).

When the court's review of a special master's decision involves statutory construction or other legal issues, the "not in accordance with law" standard is applied. *Hines*, 940 F.2d at 1527. Under that standard, the court reviews the special master's legal conclusions *de novo*, without deference. *Avera v. Sec'y of*

*Health & Human Servs.*, 515 F.3d 1343, 1347 (Fed. Cir. 2008); *Saunders v. Sec'y of the Dep't. of Health & Human Servs.*, 25 F.3d 1031, 1033 (Fed. Cir. 1994).

The third standard of review, abuse of discretion, is applicable when the special master excludes evidence or otherwise limits the record upon which he relies. *See Munn*, 970 F.2d at 870 n.10. This standard of review "will rarely come into play except where the special master excludes evidence." *Id.*

In this case, the court reviews the special master's factual findings as to the timing of R.D.S.'s first symptoms of CP under the deferential arbitrary and capricious standard. *E.g.*, *Carson v. Sec'y of Health & Human Servs.*, 97 Fed. Cl. 620, 624-25 (2010) (*Carson I*), *aff'd*, 727 F.3d 1365 (Fed. Cir. 2013) (*Carson II*). By contrast, the special master's interpretation and application of the Vaccine Act's statute of limitations present questions of law which the court reviews de novo. *Goetz v. Sec'y of Health & Human Servs.*, 45 Fed. Cl. 340, 341 (1999), *aff'd*, 4 F. App'x 827 (Fed. Cir. 2001).

## II.   The Special Master Did Not Err in Dismissing the Petition as Untimely

Petitioners argue that the special master erred in dismissing their claim as untimely under the Vaccine Act's three-year statute of limitations. Pursuant to that statute, "no petition may be filed for compensation under the Program for [a vaccine-related] injury after the expiration of 36 months after the date of the occurrence of the first symptom or manifestation of onset or the significant aggravation of such injury." 42 U.S.C. § 300aa-16(a)(2).

Petitioners assert two objections to the special master's decision. First, petitioners dispute the special master's factual finding that R.D.S. displayed symptoms of CP "in 2008 or earlier." *Somosot*, 2014 WL 1926491, at *7. According to petitioners, "there is no medical evidence in the record that R.D.S. suffered from cerebral palsy before August 24, 2011, the date cerebral palsy first appears in the medical records."[5] Pet'rs' Mot. at 10; *see also id.* at 7. In

---

[5]/ As noted by the special master and by respondent, petitioners incorrectly identify August 24, 2011 as the date on which CP is first mentioned in R.D.S.'s medical records. *See Somosot*, 2014 WL 1926491, at *4 & n.2; Resp't's Resp. at 6 & n.4, 10 & n.5. As previously discussed, Dr. Robertson first noted CP as a diagnosis on May 12, 2011. Although CP was also listed as a

(continued...)

petitioners' view, the special master erred in finding that R.D.S.'s pre-2011 symptoms were symptoms of CP because those symptoms were indicative of conditions other than CP and were not sufficient to support a CP diagnosis. *Id.* at 13, 15.

Second, petitioners argue that the special master abused her discretion by failing to give "proper weight" to the fact that R.D.S.'s treating physicians did not diagnose CP until 2011. Pet'rs' Mot. at 12 (stating that "[t]he special master erred in granting little importance to the contemporaneous medical records" demonstrating that CP was not diagnosed until 2011). Had the special master afforded appropriate weight to this fact, petitioners contend, she would have found petitioners' claim to be within the statutory limitations period. *Id.* at 11-17.

Petitioners' assertions of error reflect a misunderstanding of the applicable legal standard. As the special master correctly noted, the Federal Circuit has held that the Vaccine Act's statute of limitations "begins to run on the calendar date of the occurrence of the first medically recognized symptom or manifestation of onset of the injury claimed by the petitioner." *Cloer v. Sec'y of Health & Human Servs.*, 654 F.3d 1322, 1325 (Fed. Cir. 2011) (en banc); *see also Markovich v. Sec'y of Health and Human Servs.*, 477 F.3d 1353, 1360 (Fed. Cir. 2007) (holding that the "first symptom or manifestation of onset" of a vaccine injury, for the purposes of 42 U.S.C. § 300aa-16(a)(2), "is the first event objectively recognizable as a sign of a vaccine injury by the medical profession at large"). Contrary to petitioners' argument, "it is the first symptom or manifestation of an alleged vaccine injury, not first date when diagnosis would be possible," that triggers the Vaccine Act's statute of limitations. *Carson II*, 727 F.3d at 1369 (citing *Markovich*, 477 F.3d at 1357-58).

In *Markovich*, the Federal Circuit noted the disjunctive nature of the phrase "first symptom or manifestation of onset," and concluded that "either a 'symptom' or a 'manifestation of onset' can trigger the running of the statute, whichever is first." 477 F.3d at 1357. A symptom, the court explained, may be subtle and "indicative of a variety of conditions or ailments." *Id.* at 1357. A manifestation of onset, on the other hand, "is more self-evident of an injury and may include significant symptoms that clearly evidence an injury." *Id.* However, neither a

---

(...continued)

diagnosis on August 24, 2011, Ex. 8, at 2, 15, that is not the first reference.

symptom nor a manifestation of onset requires a definitive diagnosis of injury. *Id.* at 1358.

Applying this legal standard, the special master reasonably concluded that R.D.S. began experiencing symptoms of his later-diagnosed CP "in 2008 or earlier." *Somosot*, 2014 WL 1926491, at *7. In making this factual determination, the special master relied upon the contemporaneous medical records prepared by R.D.S.'s treating physicians in 2007 and 2008, which contained repeated references to R.D.S.'s developmental delay, abnormal motor skills and muscle tone, failure to thrive, and microcephaly. *Id.* at *6; *see, e.g.*, Ex. 5 at 23 (March 18, 2008 observation of "gross motor delays"), 24 (April 3, 2008 observation of "decreased axial skeletal tone" and inability to sit independently), 28 (noting global developmental delays and delayed speech as of May 27, 2008), 29-31 (December 18, 2008 genetics consultation noting that R.D.S. could not walk independently and suffered from microcephaly and hypertonicity); Ex. 6 at 3 (August 1, 2008 pediatric gastroenterology visit noting failure to thrive, poor weight gain, hypertonic muscles, and developmental delay); Ex. 7 at 14-15 (October 1, 2008 pediatric neurology visit revealing that R.D.S. could not crawl, walked only with a walker, sat only with support, did not point to indicate his needs, and had severe microcephaly).

The special master also relied upon Dr. Dalle-Tezze's declaration, which explained that the aforementioned symptoms were symptoms of R.D.S.'s subsequently diagnosed CP. *Somosot*, 2014 WL 1926491, at *6 (noting Dr. Dalle-Tezze's conclusion that R.D.S. "'had microcephaly from birth, failure to thrive from six months of age, and demonstrated signs of persistent developmental delay and abnormal muscle tone beginning in 2008, which were all signs and symptoms of what was subsequently diagnosed as cerebral palsy in 2011'" (quoting Ex. A at 2)). Although the special master afforded petitioners an opportunity to present an affidavit by a medical doctor refuting Dr. Dalle-Tezze's conclusions, petitioners declined to offer any rebuttal evidence.

In view of Dr. Dalle-Tezze's unrebutted testimony, which confirms that R.D.S.'s developmental delay, abnormal motor skills and muscle tone, failure to thrive, and microcephaly were objectively recognizable by the medical profession at large as constituting symptoms of CP in 2007 and 2008, the court cannot conclude that the special master acted irrationally in finding that the first symptom

of R.D.S.'s CP occurred in 2008 or earlier.  Nor does the court find any error in the special master's application of the legal standard articulated by the Federal Circuit in *Markovich* and *Cloer*.  Under that standard, as the special master correctly noted, "[t]he statute of limitations can and often does begin to run before a petitioner's condition is diagnosed definitively," and the fact that R.D.S.'s treating physicians did not diagnose CP until 2011 is of no moment.  *Somosot*, 2014 WL 1926491, at *7; *see Carson II*, 727 F.3d at 1369; *Markovich*, 477 F.3d at 1358. Accordingly, the special master did not err in dismissing petitioners' claim as time-barred under 42 U.S.C. § 300aa-16(a)(2).

Finally, with respect to petitioners' claim that the special master did not afford "proper weight" to the opinions of R.D.S.'s treating physicians, *see* Pet'rs' Mot. at 11-12, the court must disagree.  None of the records pointed to by petitioners contain medical opinions provided by treating physicians that address the issue of whether R.D.S. had symptoms or manifestations of CP in 2008 or earlier.  That specific issue is addressed by Dr. Dalle-Tezze and Dr. Dalle-Tezze's opinion on that issue is unrebutted.

Petitioners cannot proffer the absence of a diagnosis of CP in R.D.S.'s medical records as of 2008 as a counterweight to the opinion of Dr. Dalle-Tezze. The record before the special master contained no indication whether R.D.S.'s treating physicians would agree or disagree that there is evidence of CP in R.D.S.'s medical history through 2008.  The court therefore rejects petitioners' contention that the special master failed to accord proper weight to the opinions of R.D.S.'s treating physicians.

### CONCLUSION

For the foregoing reasons, the court finds no error in the special master's dismissal of petitioners' claim as untimely under 42 U.S.C. § 300aa-16(a)(2).  Accordingly, it is hereby **ORDERED** that

(1)   Petitioners' Motion for Review, filed May 6, 2014, is **DENIED**;

(2)   The decision of the special master, filed April 24, 2014, is **SUSTAINED**;

(3)    The Clerk's Office is directed to **ENTER** final judgment in accordance with the special master's decision of April 24, 2014; and

(4)    The parties shall separately **FILE** any proposed redactions to this opinion, with the text to be redacted clearly marked out or otherwise indicated in brackets, on or before **September 30, 2014**.

/s/Lynn J. Bush
LYNN J. BUSH
Senior Judge