# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
No. 13-710V
Filed: October 31, 2014
For Publication

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| RAYMOND SOMOSOT and | * | |
| WANWILAI SOMOSOT, on Behalf of | * | |
| R.D.S., a Minor, | * | |
| | * | |
| Petitioners, | * | Attorneys' fees and costs decision; |
| | * | Respondent objects to fee award; No |
| v. | * | reasonable basis; Denial of fees; Petition |
| | * | filed outside of statute of limitations |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Lorraine J. Mansfield, Las Vegas, NV, for petitioners.
Lynn E. Ricciardella, Washington, DC, for respondent.

**MILLMAN, Special Master**

### DECISION DENYING ATTORNEYS' FEES AND COSTS[1]

On April 24, 2014, the undersigned issued a dismissal decision in this case, finding the petition was untimely filed. On September 15, 2014, the decision was sustained on appeal to the U.S. Court of Federal Claims. Petitioners filed an application for attorneys' fees and costs on September 19, 2014, requesting $30,281.75.

For the reasons set forth below, the undersigned find the petition was not supported by a reasonable basis and denies petitioners' request for attorneys' fees and costs.

---

[1] Vaccine Rule 18(b) states that all decisions of the special masters will be made available to the public unless they contain trade secrets or commercial or financial information that is privileged and confidential, or medical or similar information whose disclosure would constitute a clearly unwarranted invasion of privacy. When such a decision is filed, petitioners have 14 days to identify and move to redact such information prior to the document's disclosure. If the special master, upon review, agrees that the identified material fits within the banned categories listed above, the special master shall redact such material from public access.

## PROCEDURAL HISTORY

On September 23, 2013, petitioners filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa-10–34 (2006) ("Vaccine Act"), alleging that their son, R.D.S., developed cerebral palsy ("CP") as a result of the flu vaccination he received on December 19, 2007.  Pet. at 2.

On January 13, 2014, the undersigned issued an Order to Show Cause.  The undersigned noted that although R.D.S.'s CP was diagnosed on May 12, 2011, the first symptom or manifestation of the onset of his CP occurred in 2008.  The undersigned stated that the petition was filed outside the three-year statute of limitations, 42 U.S.C. § 300aa-16(a)(2), and ordered petitioners to show cause why the case should not be dismissed.

During a telephonic status conference on January 14, 2014, the undersigned discussed her Order to Show Cause and the parties' deadlines for their respective responses and replies.

On February 6, 2014, petitioners filed a response to the Order to Show Cause.  Petitioners argued that the onset of R.D.S.'s cerebral palsy was August 2011, the date that they assert cerebral palsy first appears in the medical records.[2]  Petitioners listed symptoms of cerebral palsy, including "muscles that are very tight and do not stretch," "abnormal gait," "floppy muscles," "speech problems," and "difficulty sucking or feeding in infants."  Pet'rs' Resp. at 6–7.  Petitioners asserted that their argument is consistent with Cloer because the board-certified pediatricians who examined R.D.S. did not diagnose him with CP and would not have recognized his well-baby checkups as symptoms of CP until August 2011.  Pet'rs' Resp. at 10; Cloer v. Sec'y of HHS, 654 F.3d 1322 (Fed Cir. 2011) (en banc), cert. denied, 132 S. Ct. 1908 (2012).  They also asserted that the undersigned must seriously consider the opinions of the treating physicians and the medical records.  Id. at 11.  Petitioners asserted that R.D.S.'s hypertonicity, gross motor delays, not sitting well, and developmental delay were symptoms of other conditions and that cerebral palsy is a separate medical entity from these symptoms.  Id. at 9–10, 12.

On March 7, 2014, respondent filed a Response to Petitioners' Response to Order to Show Cause.  Respondent argued that the onset of R.D.S.'s cerebral palsy began as early as January 2008 and as late as 2009.  Resp't's Resp. at 2– 7, 9–10.  Respondent discussed Federal Circuit cases, which state that the statute of limitations begins to run at the first "symptom" or "manifestation of onset," neither of which requires a doctor to diagnose the injury definitively.  Id. at 10.

Respondent argued that the medical records and petitioners' allegations show that the claim was time-barred.  Id. at 11–12.  Respondent attached a declaration from Terry Dalle-Tezze, M.D., a medical officer employed with the Department of Health and Human Services, Division

---

[2] It is unclear why petitioners asserted that the onset of R.D.S.'s CP occurred in August 2011 instead of May 2011 when R.D.S. was first diagnosed with CP.  As noted by  respondent, petitioners refer to two different onsets in their response: August 24, 2011, Pet'rs' Resp. at 6, and August 12, 2011.  Id. at 11.  The medical records first refer to a diagnosis of CP in May 2011.  Med. recs. Ex. 9, at 2–3.

of Vaccine Injury Compensation, in which Dr. Dalle-Tezze opined that R.D.S. displayed symptoms of cerebral palsy at birth, six months of age, and throughout 2008.  Ex. A, at 2.

On March 17, 2014, petitioners filed a sur-response to the Order to Show Cause. Petitioners argued that Dr. Dalle-Tezze's declaration was inadequate because his opinion contradicts the opinions of the board-certified pediatricians and pediatric specialists who examined and treated R.D.S.  Pet'rs' Sur-Resp. at 2.  Petitioners argued that since none of these pediatricians or specialists diagnosed R.D.S. with cerebral palsy or noted it as a differential diagnosis prior to May 12, 2011, his onset could not have been prior to that date.  Id. at 3.

A telephonic status conference was held on March 19, 2014.  The undersigned discussed that petitioners did not have a medical doctor opining that R.D.S. did not exhibit signs or symptoms of CP prior to his diagnosis in May 2011.  Petitioners' counsel requested thirty days to consult with doctors to determine if any of them would offer an opinion that R.D.S.'s symptoms prior to 2011 were not indicative of CP.  On April 16, 2014, petitioners filed a status report indicating that they had no additional material to file in the matter.

The undersigned issued a dismissal decision on April 24, 2014, finding the petition was untimely because the first symptom of R.D.S.'s CP occurred in 2008 or earlier, well over three years before the petition was filed.  In her decision, the undersigned discussed the Federal Circuit opinions in Cloer, 654 F.3d 1322, and Markovich v. Sec'y of HHS, 477 F.3d 1353 (Fed. Cir. 2007), both of which held that the first symptom or manifestation of onset can occur well before a condition is diagnosed.

Petitioners filed a motion for review in the U.S. Court of Federal Claims on May 6, 2014, asserting that the undersigned's dismissal was arbitrary, capricious, an abuse of discretion, and not in accordance with law.

On September 15, 2014, Senior Judge Lynn J. Bush issued an opinion sustaining the undersigned's dismissal.[3]  Somosot v. Sec'y of HHS, No. 13-710V, 2014 WL 492328 (Fed. Cl. Oct. 3, 2014). Judge Bush stated, "Petitioners' assertions of error reflect a misunderstanding of the applicable legal standard."  Id. at *5.  She held that the undersigned reasonably relied upon the contemporaneous medical records and Dr. Dalle-Tezze's declaration to conclude that the first symptom of R.D.S.'s CP occurred in 2008 or earlier, prior to his diagnosis of CP.  Id. at *6.

Judgment entered on September 16, 2014, dismissing the petition.

Petitioners filed a motion for attorneys' fees and costs on September 19, 2014, requesting $30,281.75.  On October 2, 2014, respondent filed a Response to Petitioners' Application for Attorneys' Fees and Costs.  Petitioners filed Petitioners' Reply to Response to Petitioners' Application for Attorneys' Fees and Costs on October 9, 2014.

This matter is now ripe for adjudication.

---

[3] Pursuant to Rule 18(b) of Appendix B of the Rules of the U.S. Court of Federal Claims, the opinion was originally filed under seal on September 15, 2014, and subsequently filed as a reported opinion on October 3, 2014, after no redactions were submitted to the court.

## FACTUAL HISTORY

During her pregnancy with R.D.S., Ms. Somosot tested positive for isolated group B streptococci.  Med. recs. Ex. 3, at 7.  The results of her rubella screening were 8.6 IU/mL, which falls within the borderline range.  Id. at 12.

R.D.S. was born on March 15, 2007.  Med. recs. Ex. 1, at 1.  Ms. Somosot was treated with penicillin for her positive beta streptococci.  Med. recs. Ex. 4, at 4.  There was heavy meconium in the amniotic fluid, and "meconium" is listed as an infant complication at birth.  Id.  R.D.S. was a "poor feeder."  Id. at 5.  He had a head circumference of 32 centimeters, which is below the second percentile for his age, meeting the definition of microcephaly.  Id.; Ex. A, at 2.

On November 6, 2007, at almost eight months of age, R.D.S. saw his pediatrician with the complaint of an intermittent rash since he was three months of age.  Med. recs. Ex. 5, at 7.  The pediatrician diagnosed R.D.S. with eczema.  Id. at 8.

On December 19, 2007, at the age of nine months, R.D.S. received flu vaccine.  Med. recs. Ex. 2, at 1.

On January 15, 2008, R.D.S. was taken to Southwest Medical Associates.  Med. recs. Ex. 5, at 20.  He had been in the emergency room four days earlier with a cough and runny nose.  Id.  He was diagnosed with an ear infection and given an antibiotic and medication to help him breathe.  Id.  The diagnosis was bronchiolitis.  Id.  He had previously had fever, but the fever stopped.  Id.

On March 18, 2008, R.D.S. returned to Southwest Medical Associates.  Id. at 22.  He was on Albuterol Sulfate and Pulmicort.  Id.  He had an upper respiratory infection lasting one week, consisting of low-grade fever, runny nose, and cough.  Id.  He had some vomiting after feeding.  Id.  He was diagnosed with gross motor delays.  Id. at 23.

On April 3, 2008, R.D.S. returned to Southwest Medical Associates.  Id. at 24.  His pediatrician noted that he appeared to have decreased axial skeleton tone.  Id.  His parents said he was unable to sit independently very well.  Id.  He was assessed with reactive airway disease and gross motor delays.  Id. at 25.

On April 10, 2008, R.D.S. continued to be assessed with reactive airway disease.  Id. at 26.

On May 27, 2008, R.D.S. was noted to have some global developmental delays and delayed speech.  Id. at 28.

On June 27, 2008, R.D.S. saw Dr. Ajaz Ahmad Sheikh, a pediatric gastroenterologist, for a history of vomiting since he was a baby.  Med. recs. Ex. 6, at 6.  R.D.S.'s father said that in the previous one and one-half months, there had been an increase in the frequency of R.D.S.'s vomiting.  Id.  R.D.S. vomited after almost every feeding and, many times, he refused to eat during the day.  Id.  R.D.S.'s mother said that he was losing weight.  Id.  He had difficulty with

feeding when he was born, and he was receiving early intervention services for developmental delay. Id.

On August 1, 2008, R.D.S. returned to Dr. Sheikh. Id. at 2. Dr. Sheikh noted that R.D.S. had a history of poor weight gain and vomiting but was doing well on Zantac. Id. On examination, R.D.S. had increased muscle tone in his extremities and developmental delay. Id. Dr. Sheikh's assessment was that R.D.S. had a history of failure to thrive, poor weight gain, and hypertonic muscles with developmental delay. Id. at 3.

On October 1, 2008, at one year and six months old, R.D.S. saw Dr. Donald W. Johns, a neurologist, because he was not eating well and had delayed motor skills. Med. recs. Ex. 7, at 15. R.D.S. walked using a walker. Id. He could not crawl. Id. He did not point to indicate his needs. Id. The parents thought R.D.S.'s language peaked in January 2008, and then he lost some abilities. Id. R.D.S. had environmental allergies, a question of reactive airway disease, eczema, and Mongolian spot. Id. R.D.S. did not sit without support. Id. at 14. His head circumference was 44.4 centimeters, about four standard deviations below mean. Id. Dr. Johns' impression was that R.D.S. had severe microcephaly. Id. Dr. Johns was concerned about a possible degenerative condition. Id.

On December 18, 2008, R.D.S. had a genetics consultation with Dr. Colleen A. Morris. Med. recs. Ex. 5, at 29. The reason for the referral was microcephaly and developmental delay. Id. R.D.S.'s mother reported that R.D.S. seemed to have normal development for his first four months of life. Id. at 30. At the age of nine months, R.D.S. went with his family to California for a visit, and he was ill when he came home. Id. He could not breathe well, had an ear infection, and did not eat anything for four days. Id. He went to the emergency room, where he was given IV fluids and breathing treatments. Id. R.D.S.'s mother reports that after this illness, R.D.S. was not himself, was more irritable, and would cry much of the time. Id. She also said she was concerned because his development seemed to stop. Id. At 17 months, he was noted to have head lag, and at 19 months, he could tripod sit but was not yet walking. Id. His mother noted he had bilateral cortical thumbs for quite some time before the visit with Dr. Morris. Id. He had Mongolian spots over his skin, significant eczema, and gastroesophageal reflux disease in the past. Id. Whenever his family tried to get him to bear weight, he would stand on his toes. Id. He was receiving physical therapy once a week. Id.

At the December 18, 2008 visit with Dr. Morris, R.D.S.'s family reported that he had a workup for failure to thrive because his length had been consistently at the third percentile, and his weight at two months was at the tenth percentile, but by nine months was below the third percentile. Id. His weight for height at the time of examination was just below the third percentile. Id. His head circumference at birth was at the second percentile and was below the second percentile at the age of four months. Id. His head circumference was growing but was falling further away from the curve over time. Id. When Dr. Morris examined R.D.S., his height was in the third percentile, and his weight and head circumference were below the third percentile. Id. He had ridging of the anterior sagittal and metopic sutures and frontal narrowing of the cranium. Id. He had hyperreflexia in his lower extremities. Id. at 31. His heel cords were tight. Id. When attempting to get R.D.S. to bear weight, Dr. Morris found that he would stand only on his toes. Id. Dr. Morris diagnosed R.D.S. with microcephaly and hypertonicity. Id. Dr.

Morris noted that based on her review of the records, he did not have microcephaly before becoming ill at age nine months.  Id.

On June 1, 2009, Sunshine Valley Pediatrics listed R.D.S. as having developmental delay.  Med. recs. Ex. 8, at 2.

On August 13, 2009, at the age of two years and five months, R.D.S. saw Dr. Johns again for a pediatric neurological evaluation.  Med. recs. Ex. 7, at 12.  Dr. Johns noted that R.D.S. had increased tone with gait, suggestive of white matter disease.  Id. at 11.  When placed in a standing and supported position, R.D.S. walked on his toes, flexed his elbows, and pronated his forearms.  Id.  Dr. Johns diagnosed R.D.S. with microcephaly and developmental delay of unclear etiology and recommended a pediatric orthopedic evaluation.  Id.

On August 31, 2009, R.D.S. saw Dr. Howard I. Baron, a pediatric gastroenterologist, for failure to thrive.  Med. recs. Ex. 6, at 21.  Dr. Baron noted that R.D.S. was very behind verbally.  Id.  He took fluids exclusively by bottle but was working on drinking through a straw.  Id.  His growth was satisfactory, although below the growth curve since his last visit.  Id.  He had dysphagia, choking on solids or water.  Id.  Dr. Baron's assessment was that R.D.S. was self-limited in his ability to tolerate a variety of textures.  Id. at 22.  Dr. Baron suggested high-density calories packed in purees and milks to help R.D.S. grow.  Id.

On December 17, 2009, R.D.S. saw Dr. Roshan Raja, a pediatric neurologist, for hypertonia and developmental delay.  Med. recs. Ex. 7, at 1.  R.D.S. was not walking and had not been sitting even at nine months.  Id.  He was first noted to have a problem after a significant viral infection when he was nine months old.  Id.  After this viral infection, R.D.S. regressed further with some aspects, such as speech and weight.  Id.  At that time, he was also stiff and had cortical thumbing.  Id.  He started therapy at fifteen months and began improving his fine motor skills.  Id.  However, comprehension was difficult.  Id.  He wore braces and wrist splints, and he drooled.  Id. at 2.  Dr. Raja's impression was developmental delay, post-infectious worsening of delays, microcephaly, and hypertonia.  Id. at 3.

Cerebral palsy is first mentioned in the medical records in May 2011.  Med. recs. Ex. 8, at 18.  On May 12, 2011, R.D.S. was seen for a follow up of a head injury at Sunshine Valley Pediatrics.  Med. recs. Ex. 8, at 18; Ex. 9, at 3.  Dr. Robertson notes cerebral palsy as a diagnosis.  Id.  The records thereafter mention CP as one of R.D.S.'s diagnoses.  See, e.g., Ex. 8, at 2, 11, 15, 17.

On either May 9, 2011 or May 9, 2013,[4] R.D.S.'s pediatrician, Dr. Wesley J. Robertson at Sunshine Valley Health Care, wrote on a prescription pad that R.D.S. had a severe fever two weeks after a flu vaccination at nine months of age and developed severe cerebral palsy afterward.  Med. recs. Ex. 9, at 2.  Dr. Robertson wrote it is "possible" the vaccine was the cause of the CP.  Id.

---

[4] The year is illegible in the medical record.

**DISCUSSION**

Under the Vaccine Act, a special master or a judge on the Court of Federal Claims may award fees and costs for an unsuccessful petition if "the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." 42 U.S.C. § 300aa-15(e)(1); Sebelius v. Cloer, 133 S. Ct. 1886, 1893 (2013).

"Good faith" is a subjective standard. Hamrick v. Sec'y of HHS, No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007). A petitioner acts in "good faith" if he or she holds an honest belief that a vaccine injury occurred. Turner v. Sec'y of HHS, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Petitioners are "entitled to a presumption of good faith." Grice v. Sec'y of HHS, 36 Fed. Cl. 114, 121 (Fed. Cl. 1996).

"Reasonable basis" is not defined in the Vaccine Act or Program rules. It has been determined to be an "objective consideration determined by the totality of the circumstances." McKellar v. Sec'y of HHS, 101 Fed. Cl. 297, 303 (Fed. Cl. 2011). In determining reasonable basis, the court looks "'not at the likelihood of success [of a claim] but more to the feasibility of the claim.'" Turner, 2007 WL 4410030, at *6 (citing Di Roma v. Sec'y of HHS, No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993)). Factors to be considered include factual basis, medical support, jurisdictional issues, and the circumstances under which a petition is filed. Turner, 2007 WL 4410030, at *6–*9. Traditionally, special masters have been "quite generous" in finding reasonable basis. Turpin v. Sec'y of HHS, No. 99-564V, 2005 WL 1026714, at *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005); see also Austin v. Sec'y of HHS, No. 10-362V, 2013 WL 659574, at *8 (Fed. Cl. Spec. Mstr. Jan. 31, 2013) ("The policy behind the Vaccine Act's extraordinarily generous provisions authorizing attorney fees and costs in unsuccessful cases—ensuring that litigants have ready access to competent representation— militates in favor of a lenient approach to reasonable basis."). Special masters have found reasonable basis to file a claim absent medical records or opinions supporting vaccine causation. See Austin, 2013 WL 659574, at *8; Hamrick, 2007 WL 4793152.

In Cloer, the Supreme Court found that a petition filed outside the statute of limitations may nevertheless merit an award of attorneys' fees and costs if it is supported by good faith and a reasonable basis. 133 S. Ct. at 1896–97. The Court reasoned that the Vaccine Act's fee-shifting provision does not incorporate the statute of limitations, and there is no explanation for why Congress would have intended to discourage counsel from representing petitioners because of the "difficulty of distinguishing between the initial symptoms of a vaccine-related injury and an unrelated malady." Id. at 1893–94, 1895.

Petitioners are entitled to a presumption of good faith, and respondent does not contest that the petition was filed in good faith. There is no evidence that this petition was brought in bad faith; therefore, the undersigned finds that the good faith requirement is present.

In contrast, respondent does contest that this petition is supported by a reasonable basis. Respondent argues that petitioners have offered no evidence to establish a reasonable basis for the filing of the untimely petition. Resp. at 11. Respondent states that "petitioners appear solely to rely upon their own and their counsel's mistaken interpretation of what constitutes the first

symptom or manifestation of onset of injury as evidence of a reasonable basis for filing out of time." Id.

Petitioners assert that they reasonably believed R.D.S's vaccine-related symptoms began within the limitations period based upon the opinion of Dr. Wesley Robertson, R.D.S.'s pediatrician. Reply at 6. On either May 9, 2011 or May 9, 2013, Dr. Robertson wrote on a prescription pad that R.D.S. had a severe fever two weeks after receiving the flu vaccine (which would be early January 2008) and later developed cerebral palsy. Med. recs. Ex. 9, at 2. He noted, "It is possible the vaccine was the cause of the CP." Id.

Dr. Robertson's notation about possible vaccine causation does not support a reasonable belief that the petition filed in September 2013 was timely. As Judge Bush stated, none of the medical records "contain medical opinions provided by treating physicians that address the issue of whether R.D.S. had symptoms or manifestations of CP in 2008 or earlier." Somosot, 2014 WL 494238, at *7. A review of the relevant case law and the medical records should have alerted petitioners and their counsel that this case was untimely.

The Vaccine Act does not bar the award of attorneys' fees and costs for all untimely petitions. Cloer, 133 S. Ct. at 1896–97. For example, an untimely petition might be supported by reasonable basis if the law regarding the statute of limitations were unclear.[5] However, in this case, the law regarding onset is clearly established. In 2011, an en banc Federal Circuit reiterated the standard given in Markovich, 477 F.3d 1353: "The statute of limitations in the Vaccine Act begins to run on the date of occurrence of the first symptom or manifestation of onset of the vaccine-related injury. . . ." Cloer, 654 F.3d at 1335. Petitioners filed their petition in 2013, giving them ample time to review the applicable legal standard.

Likewise, a petition might be supported by a reasonable basis if a petitioner reasonably believed his or her symptoms began within the limitations period. For example, there might be a factual dispute in a case filed on July 1, 2013, as to whether a petitioner first started showing symptoms in June 2010 or July 2010. In such a case, the petitioner might have a reasonable basis for bringing the petition if he or she had evidence the first symptom occurred within the statute of limitations, even if this evidence was later discredited. However, this is not such a case. Here, the medical records clearly demonstrate that R.D.S. exhibited symptoms of cerebral palsy in 2008, five years before the petition was filed. Petitioners did not have a reasonable basis to believe that R.D.S.'s first symptom of cerebral palsy occurred after September 23, 2010, and thus did not have a reasonable basis to file the petition. Petitioner's misunderstanding of the applicable legal standard relating to section 16(a)(2) (when the statute of limitations begins to run) does not make the filing of their petition reasonable.

---

[5] For example, if this petition had been filed between May 2010 and August 2011, it might be supported by a reasonable basis. In 2010, a Federal Circuit panel ruled that the statute of limitations does not begin to run until the "medical community at large" recognizes a causal link between the type of vaccine and type of injury. Cloer v. Sec'y of HHS, 603 F.3d 1341, 1349 (Fed. Cir. 2010). Upon an *en banc* rehearing, the Federal Circuit reversed the panel opinion, holding that the statute of limitations begins to run at the first symptom or manifestation of onset. 654 F.3d 1322, 1335 (Fed. Cir. 2011) (en banc).

**CONCLUSION**

The undersigned finds that there was no reasonable basis to bring this petition, based on the clearly established law that the statute of limitations begins to run on the date the first symptom or manifestation of onset occurs.  42 U.S.C. § 300aa-16(a)(2).  Petitioners' request for attorneys' fees and costs is **DENIED.**

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[6]

**IT IS SO ORDERED.**

Dated: <u>October 31, 2014</u>                                                          /s/ Laura D. Millman
                                                                                               Laura D. Millman
                                                                                               Special Master

---

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party, either separately or jointly, filing a notice renouncing the right to seek review.